**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **TRAVIS AND NICOLE GREGORY, DONALD AND ERI HALEY, CRAIG AND DIXIE SARGENT, LARRY FISHER, STEPHEN AND KAREN BEVERLEY, CHAD AND HEATHER HANSEN, TRACY WOODBURY, DAVID PETERSON, MIKE ISRAEL, E. WAYNE LARSON, DARLA KETCHAM, CARVEL ANDERSON, KELLY AND AMY SPRINGER, and WAYNE BAKER, on behalf of themselves and all others similarly situated,** | **Case No.** |
| **Plaintiffs,** | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **vs.** | |
| **ZIONS BANCORPORATION,** | |
| **Defendant.** | |

## I.     NATURE OF THE ACTION

1.      Plaintiffs are victims of an enormous Ponzi scheme knowingly assisted by Zions Bank ("Zions Bank" or the "Bank"), a division of Defendant Zions Bancorporation ("Defendant"). By its substantial assistance, including the actions of the Bank and its employees in furtherance of and to facilitate the scheme, and through its actual knowledge that fiduciary funds it held as custodian were being diverted and used for Ponzi payments, Zions Bank aided

and abetted the scheme. Moreover, Zions Bank was negligent in failing to act, as it was required to do once it became aware that investor money, *i.e.*, fiduciary funds for which it acted as custodian, were being diverted.

2.       The scheme was perpetrated by Gaylen Rust ("Rust") and members of his family, who, through Rust's company, Rust Rare Coin, Inc. ("RRC"), raised money from investors ostensibly to purchase contracts of sale for silver. Rust told investors he was pooling their money in a silver trading pool that he managed (the "Silver Pool"), and through a proprietary trading system he employed, and through a trading account he purportedly held at HSBC Bank, one of the world's largest financial institutions, was using the money in the Silver Pool to sell silver as market prices rose, and buy silver as market prices fell, thereby increasing the amount of silver in the Silver Pool. Rust also claimed that he maintained large amounts of physical silver owned by the Silver Pool at warehouses owned and operated by Brink's Incorporated ("Brink's") where it was being held for safekeeping.

3.       To solicit investors, Rust touted his supposed successful track record in buying and trading silver, luring investors with the promise of double-digit returns averaging 20 to 25% per year on their investment in the Silver Pool. Rust provided investors with periodic statements reflecting those supposed returns.

4.       In reality, however, Plaintiffs' investment in the Silver Pool was a sham. Rust was not buying or selling silver, nor did he have physical silver stored in a Brink's warehouse. Moreover, neither Rust nor RRC maintained an account at HSBC. Instead, Rust diverted investor money to himself and to his family, to other flailing companies Rust or his family members controlled, and used new investor money to make payments to earlier investors seeking to liquidate all or part of their interests in the Silver Pool. In reality, the statements Rust provided to

his investors and the returns stated thereon were fake. Rust was not earning profits from buying and selling silver, and instead was making those distributions from the money received from new investors. The Silver Pool was not a real business or trading operation, and instead was a Ponzi scheme.

5.      Rust could not have perpetrated the Silver Pool scam on his own. Instead, he crucially depended on the knowing participation of his bank, Zions Bank, through which Rust committed his fraud. As explained in more detail herein, the epicenter of Rust's Silver Pool scheme was one account at Zions Bank ending in number 7496, known to investors, and referred to herein as the "Silver Pool Investment Account."

6.      Also, as explained in more detail herein, the investigation of Plaintiffs' counsel, which investigation included interviews with many Silver Pool investors, a review and analysis of numerous documents related thereto, and a review and analysis of other documents including documents obtained in a civil enforcement action filed by the Commodity Futures Trading Commission ("CFTC"), and the State of Utah Division of Securities ("Utah"), demonstrates that Zions Bank had *actual knowledge* that: (1) RRC was a precious metal and coin dealer, and thus was a high-risk account, triggering enhanced due diligence requirements for the Bank; (2) RRC had a silver trading operation called the Silver Pool; (3) RRC received investment proceeds from investors in the Silver Pool to be invested by RRC and Rust; (4) RRC and Rust were managing investor money as fiduciaries, and thus the Silver Pool account held fiduciary funds; (5) RRC and Rust were misusing funds from the Silver Pool Investment Account by commingling such funds and transferring them to Rust, his family, and other entities whose business was unrelated to the Silver Pool; and (6) RRC and Rust were misusing investor money to make Ponzi payments.

7.      On November 13, 2018, Rust's scheme began to unwind. On that date, the CFTC and Utah filed their civil enforcement action against Rust, certain members of his family, and RRC charging them with fraud and asserting violations of the Commodities and Exchange Act and CFTC Regulations, aiding and abetting those violations, and multiple violations of the Utah Uniform Securities Act.

8.      On November 15, 2018, two days later, the Securities and Exchange Commission ("SEC") filed its own action charging Rust and RRC with operating a fraudulent silver trading program. The SEC complaint alleged the same course of conduct alleged by CFTC/Utah; that Rust made material misrepresentations and omissions to solicit investors across the country to invest in his scheme. The SEC also charged Rust and RRC with fraud and asserted numerous violations of the federal securities laws.

9.      Plaintiffs and the putative class members were victims of Rust's Silver Pool investment scheme. They invested their personal money in what they believed to be the Silver Pool, and were damaged thereby.

10.     Plaintiffs bring this action on their own behalf and on behalf of a class of all persons similarly situated to recover damages from Defendant sustained as a result of the Bank's own independent wrongdoing and knowing assistance in the Silver Pool scam.

## IV.    PARTIES

11.     Plaintiffs Travis and Nicole Gregory are husband and wife and residents of West Valley City, Utah. Mr. and Mrs. Gregory invested in the Silver Pool Investment Program on several occasions from July 2013 to January 2018 and suffered significant financial losses. Some or all of Mr. and Mrs. Gregory's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

12.    Plaintiffs Donald and Eri Haley are husband and wife and residents of American Fork, Utah. Mr. and Mrs. Haley invested in the Silver Pool Investment Program on several occasions from Mary 2015 to March 2018 and suffered significant financial losses.  Some or all of Mr. and Mrs. Haley's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

13.    Plaintiffs Craig and Dixie Sargent are husband and wife and residents of Coalville, Utah. Mr. and Mrs. Sargent invested in the Silver Pool Investment Program on several occasions from April 2016 to June 2016 and suffered significant financial losses.  Some or all of Mr. and Mrs. Sargent's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

14.    Plaintiff Larry Fisher is an individual and a resident of North Salt Lake, Utah. Mr. Sargent invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Mr. Fisher's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

15.    Plaintiffs Stephen and Karen Beverley are husband and wife and residents of South Jordan, Utah. Mr. and Mrs. Beverley invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Mr. and Mrs. Beverley's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

16.    Plaintiffs Chad and Heather Hansen are husband and wife and residents of Lima, Montana. Mr. and Mrs. Hansen invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Mr. and Mrs. Hansen's investments in the Silver Pool

Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

17.     Plaintiff Tracy Woodbury is an individual and a resident of Taylorsville, Utah. Ms. Woodbury invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Ms. Woodbury's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

18.     Plaintiff David Peterson is an individual and a resident of Bountiful, Utah.  Mr. Peterson invested in the Silver Pool Investment Program and suffered significant financial losses. Some or all of Mr. Peterson's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

19.     Plaintiff Mike Israel is an individual and a resident of Riverton, Utah.  Mr. Israel invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Mr. Israel's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

20.     Plaintiff E. Wayne Larson is an individual and a resident of Centerville, Utah. Mr. Larson invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Mr. Larson's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

21.     Plaintiff Darla Ketcham is an individual and a resident of Taylorsville, Utah.  Ms. Ketcham invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Ms. Ketcham's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

22.    Plaintiff Carvel Anderson is an individual and a resident of West Jordan, Utah. Mr. Anderson invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Mr. Anderson's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

23.    Plaintiffs Kelly and Amy Springer are husband and wife and residents of Lehi, Utah. Mr. and Mrs. Springer invested in the Silver Pool Investment Program and suffered significant financial losses.  Some or all of Mr. and Mrs. Springer's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

24.    Plaintiff Wayne Baker is a resident of Freedom, Wyoming. Mr. Baker invested in the Silver Pool Investment Program and suffered significant losses. Some or all of Mr. Baker's investments in the Silver Pool Investment Program were made to and/or held in the Silver Pool Investment Account at Zions Bank.

25.    Defendant Zions Bancorporation is a national bank headquartered in this District at One South Main Street, Salt Lake City, Utah. Zions Bank is an unincorporated division of Defendant Zions Bancorporation that conducts banking business in Utah, Idaho, and Wyoming.

## V.    RELEVANT NON-PARTIES

26.    Gaylen Rust is an individual residing in Layton, Utah. He is the president and sole director of RRC and operates the RRC store in downtown Salt Lake City, Utah.

27.    RRC is a Utah corporation with its principal office in Salt Lake City. It was founded in 1966 by Rust's father. RRC claims to sell rare coins, collectible paper money, and precious metal bullion through its retail store and website. Rust is the owner, president, and sole director of RRC. RRC is not named as a defendant because it has been ordered into receivership

and naming it would violate the Court's Order staying any actions against RRC, Docket #22 filed on 11/15/2018 in the CFTC Case.

28.     Denise Rust is an individual residing in Layton, Utah. She is Gaylen Rust's wife, and assists in managing RRC's day-to-day operations.

29.     Joshua Rust (together with Gaylen Rust, Denise Rust, and RRC, the "Rust Scheme Perpetrators") is an individual residing in Draper, Utah. He is Gaylen and Denise Rust's son, and manages RRC's day-to-day operations.

## VI.     JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over all counts under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), pursuant to which this Court has diversity jurisdiction because some class members are citizens of States different than Defendant, and because the amount in controversy exceeds the sum or value of $5,000,000.

31.     Venue is proper in this District because many of the acts giving rise to Plaintiffs' claims occurred in this District, and because Defendant is headquartered, and does substantial business in this District.

## VII.     FACTS

**a.      Defendant Helps Rust Operate the Silver Pool Investment Program, and Raise Money from Investors.**

32.     RRC and Rust maintained several accounts with Zions Bank, including the Silver Pool Investment Account ending in 7496. The Silver Pool Investment Account was opened on January 21, 2015,[1] and was intended to provide an easy way for investors to deposit the money they wished to invest in RRC's Silver Pool investment program. Investors wired funds or mailed

---

[1] *See* Ex. 1, Zions Bank Signature Card. Prior to account number ****7496, RRC and Rust used account number ****3564. They will both be referred to as the "Silver Pool Investment Account.".

checks made out to RRC to Zions Bank, and Zions Bank processed those checks and manually processed those wires – many of which contained the notation "investment" -- and took control and custody of the investors' money.

33.     RRC and Rust stamped the checks deposited in the Silver Pool Investment Account with a stamp that stated: PAY TO THE ORDER OF ZIONS FIRST NATIONAL BANK UT 124000054 FOR DEPOSIT ONLY RRC AFFILIATE ACCOUNT *****7496:



34.     Most of the wires, which were required to be manually processed and/or reviewed by Defendant's employees overseeing the Silver Pool Investment Account, indicated on their face, in various wording, that they represented investments in RRC's silver trading program. An example of a wire received and reviewed by Defendant is below:[2]

---

[2] See, Ex. 2.

| Reference Number: 20180226- | |
|---|---|
| Source FED | |
| Send 26FEB201 | Transaction Type  FTR |
| Date 8 | Owning Bank |
| Value 26FEB201 | 001 Repetitive |
| Date | Code |
| Statu | |

| Debit  information | Credit  information |
|---|---|
| Account: • ━ | Credit:  •749 |
| BANK OF AMERICA, N.A., | 6  RUST RARE |
| NY NEW YORK, NY | COIN NC |
| Amount:  1,000,000.00 USO | DENISE G RUST, GAYLEN D |
| Recon Ref: | RUST, JOSH RU 242 E BROADWAY |
| Sending Bank Reference | SALT LAKE CITY UT 84111-2419 84111 |
| 2018022600330496  Ordering Bank: S/ | Advising  instructions: |
| BOFAUS3N | |
| BANK OF AMERICA, | Amount:  1,000,000.00 USO |
| N.A. 222 BROADWAY | Recon |
| NEW YORK, NY, US | Ref: |
| Originator Reference: 224674716 | Chann |
| Originator: I 000495460990 | el: |
| L          FAMILY REVOCABLE LIVING TRS | LTR |
| V━ ━ 1L11 TRTEE | Originator to  Beneficiary |
| | information:  SILVER INVESTMENT |
| ████████ CH CA 93953-1225 | |
| Bank to Bank  information: | |

35.    Once investors' funds were deposited into the Silver Pool Investment Account, investors expected that RRC would withdraw those funds periodically to purchase silver.[3] Based on Rust's statements, investors expected to earn a profit on their investments from Rust's silver trading program Rust claimed he developed to "buy low, sell high."[4]

---

[3] *See* Ex. 3, Hess Dec. ¶6
[4] *See* Ex. 4, CFTC Ex Parte Motion for Statutory Restraining Order, Expedited Discovery, Preliminary Injunction, and Other Equitable Relief, ("CFTC Motion"), p. 10.

36.     Zions Bank allowed Rust and RRC to open and operate the Silver Pool Investment Account notwithstanding their failure to register themselves and the Silver Pool with the Utah Division of Securities, the SEC, or the CFTC.

37.     Moreover, Individual 1, identified by Plaintiffs' counsel through interviews with investors and the investigation of counsel, was a senior officer at Zions Bank. Individual 1 provided crucial assistance to the Rust Scheme Perpetrators and became aware of the fraud. Specifically, Individual 1 was aware that Rust was operating the Silver Pool and was receiving investor money because Individual 1 was identified and often served as a direct point of contact for investors who had questions or concerns about how to deposit money into the Silver Pool Investment Account. Thus, Individual 1 interacted frequently with investors about their investments, and was well-aware that the funds coming into the Silver Pool Investment Account belonged to investors and were fiduciary funds to be managed by Rust and RRC

38.     In addition, Individual 1 was aware that Rust's Silver Pool had no substantive operations because Individual 1 interacted frequently with Rust and his family members and often reviewed the Silver Pool Investment Account. Individual 1 was the contact person to whom Rust's family reached out for any issues pertaining to their accounts. Individual 1 engaged in various business dealings with Rust and his family including through processing loans to them extended by Zions Bank, which loans required a detailed examination of the Rust family's entire financial operations prior to approval. Individual 1 necessarily reviewed the Silver Pool Investment Account because the Silver Pool Investment Account experienced an enormous amount of insufficient fund events, each of which had to be reviewed manually by a senior person at Zions Bank as part of the Bank's procedure whereby it had to decide whether to honor each payment on Rust's behalf. Further, Individual 1 reviewed the Silver Pool Investment

11

Account in connection with Rust and RRC's applications for financing, and also pursuant to Defendant's anti-money laundering and Bank Secrecy Act policies and procedures, more fully described below. Thus, Individual 1 saw the transactions in the Silver Pool Investment Account, including the lack of any disbursements for the purchase of silver, the diversions to Rust and his businesses, the use of investor money to repay a loan to Zions Bank,[5] and the use of new investor money to pay prior investors.

        **b.**      **Rust and RRC Were Fiduciaries of Plaintiffs and the Other Investors.**

39.      Rust and RRC were fiduciaries of Plaintiffs and the other investors in the Silver Pool scheme. Rust encouraged investors to turn over their money to the Silver Pool for Rust to invest on their behalf using his proprietary trading plan. Plaintiffs and the other investors were required to rely entirely on the skill and intelligence of Rust to manage their investments. Rust and RRC were acting as fiduciaries for Plaintiffs and the other Silver Pool investors.

        **c.**      **The Silver Pool Investment Program Was a Ponzi Scheme.**

40.      Plaintiffs and other investors who invested in the Silver Pool were told that the money would be used to buy and sell silver. Rust and RRC told investors that they would sell silver held in the Silver Pool as the market prices rose, and buy silver for the Silver Pool as market prices fell. Rust told investors that he had a personal relationship with a commodity analyst through which Rust was able to obtain information regarding when the bank and other market participants planned to sell large quantities of physical silver, driving down market prices. By trading silver in this manner, Rust claimed he was able to generate extraordinarily high returns, averaging twenty to twenty-five percent per year, and sometimes as high as forty percent or more. The silver was allegedly stored at a Brink's facility in either Salt Lake City or

---

[5] *See,* Ex. 12, showing monthly loan repayments paid out of the Silver Pool Investment Account.

Los Angeles, and the silver transactions were allegedly made through an account Rust claimed he maintained at HSBC. Rust and RRC provided investors with account statements that showed him making money on every single trade he purportedly executed on behalf of the Silver Pool.

41.     Rust further told investors that Rust and RRC used the profit he generated from his trades to repurchase larger amounts of silver at the lower price, thereby continually increasing the amount of silver he holds for investors and thus increasing the value of each investor's account. Rust and RRC also represented to investors that Rust and RRC possessed approximately $77 to $80 million of physical silver on behalf of the Silver Pool they stored at Brink's.

42.     In reality, Rust was operating a Ponzi scheme. The Silver Pool Investment Account did not reflect any transactions in silver. Instead, the majority of the new investor money was used to pay prior investors in facially obvious Ponzi fashion, and much of the rest of the investor money in the Silver Pool Investment Account was diverted to other businesses controlled by Rust, including R. Legacy Entertainment, R. Legacy Racing, and R. Legacy Investments. None of those entities were involved in or had anything to do with the purchase or sale of silver. Ex. 11, Blaylock Dec. ¶9.

43.     Other distributions were made to family members for a variety of personal uses, including to Rust's wife, Denise Rust, his son, Joshua, and his daughter, Aleesha. All of those conspicuous distributions were made out of the Silver Pool Investment Account.

44.     Documents obtained by the CFTC directly from Zions Bank, which included, among other things, copies of bank account statements, canceled checks and wire data, demonstrate Rust's misappropriation. Specifically, between May 1, 2018 and August 31, 2018, more than $42 million in new investor funds were deposited and commingled in the Silver Pool

Investment Account. During this same time period, approximately $28 million, or 67% of the money raised from new investors was used to pay earlier investors in classic and facially obvious Ponzi fashion, as the following three examples demonstrate:

a. On May 1, 2018, the Silver Pool Investment Account had a balance of $33,438. On the same day, the account received deposits from various investors totaling $571,400. On this same day, most of the new investor money -- $446,620 -- was distributed to earlier investors, and $34,171 was distributed to Rust's company, R. Legacy Entertainment;

b. Three weeks later, on May 23, 2018, the Silver Pool Investment Account had a balance of $16,230.06. On the same day, the account received a $500,000 deposit from an investor. On this same day, distributions totaling $453,912 were made to earlier investors, an amount that was approximately 88 percent of the total account balance after the investor deposit;

c. Similarly, on June 1, 2018, the Silver Pool Investment Account had a balance of $333,528.96. On the same day, the account received deposits from two investors in the amount of $1,141,000. On the same day, distributions totaling $624,000 were paid to other unrelated investors, and $142,100 was transferred to Rust's company R. Legacy Entertainment.

45.    The CFTC documents also reflect examples of investor money being diverted to Rust, the members of his family, and the other business ventures Rust controlled:

a. Approximately $7 million of investor money was transferred from the Silver Pool Investment Account to Rust's other accounts at Zions Bank where the investor money was commingled with the revenue and expenses of RRC's coin shop business managed by Rust's son Joshua. Rust, RRC and Joshua used just over $15 million of those commingled funds to purchase precious metals and coins from wholesalers, dealers, and individuals, and in turn, sold just over $9 million in precious metals and coins to wholesalers, dealers, and individuals, meaning that the net purchases of precious metals amounted to approximately $5.8 million despite having raised over $42 million from investors;

b. Approximately $6 million was transferred to Rust-controlled companies including Legacy Entertainment, Legacy Racing, and

Legacy Investments;

    c.    Over $130,000 was transferred to Rust's wife, Denise Rust and $121,500 was transferred to his daughter, Aleesha;

46.    The CFTC documents also include examples of specific payments out of the Silver Pool Investment Account for personal expenditures including:

    *a.*    Zions Bank Silver Pool Investment Account check # 19412 for $35,000, dated April 9, 2018, was made payable to a person or entity to cover his, her or its 2017 taxes; Ex. 10, p. 1

    b.    Zions Bank Silver Pool Investment Account check # 19233 for $50,000, dated March 6, 2018, paid for a concrete pour for a cabin and steel building; Ex. 10, p. 2

    *c.*    Zions Bank Silver Pool Investment Account check # 20114 for $8,502.47, dated July 17, 2018, paid for a "new roof"; Ex. 10, p. 3

    *d.*    Zions Bank Silver Pool Investment Account check # 19057 for $15,000, dated February 7, 2018, was used to purchase a Volvo loader; Ex. 10, p. 4
        Zions Bank Silver Pool Investment Account check #19449 for $2,000, dated April 16, 2018, covered wedding expenses; Ex. 10, p. 5

    e.    Zions Bank Silver Pool Investment Account check # 19883 for $1,000, dated June 12, 2018, was used to pay a Wells Fargo credit card bill; Ex.10, p. 6

47.    These transactions clearly demonstrate that the Silver Pool operated as a classic Ponzi scheme, Rust was orchestrating a massive fraud and theft of investor money, and that such Ponzi scheme and theft were visible to – and as shown herein were seen by – Defendant in the Silver Pool Investment Account. The scheme was supported solely by new investor money and not transactions in silver, and the account statements Rust was providing to investors showing generous returns were fake. No payments were ever made out of the Silver Pool Investment Account to HSBC to cover the purchase of silver, and no deposits were ever made into the Silver

Pool Investment Account following the sale of silver, since neither Rust nor RRC had an account with HSBC to trade silver. *See* Ex. 5 (Dec. of Matt J. Flanigan)

48.     Similarly, no fees were ever paid to Brink's out of the Silver Pool Investment Account to compensate Brink's for the allegedly significant amount of silver that Brink's stored and protected for the Silver Pool investors, since neither Rust nor RRC maintained physical silver at a Brink's warehouse. *See* Ex. 6 (Dec. of Shane Housley).

**d.     The Silver Pool Fraud Was Perpetrated Through a Single Account Maintained by Defendant.**

49.     While RRC and Rust maintained a few accounts at Zions Bank (Ex. 7, Strong Dec. at pp. 10-11), as the Bank knew, all of the funds deposited by hundreds of Silver Pool investors were deposited into a single account, the Silver Pool Investment Account. The funds deposited by one investor were commingled with funds deposited by other investors, and quite often, used to fund distributions to earlier investors who were seeking to liquidate all or a portion of their holdings.

50.     RRC and Rust thus did not try to hide what they were doing from Zions Bank by moving money from one account to another, or from Zions Bank to another bank. All of the deposits and distributions of investor money were made out of this one account.   This arrangement made it easier for Defendant to notice the improper operations in the Silver Pool Investment Account, and see the Ponzi scheme payments and misuse of investor money.

**e.     Defendant Was Aware that Rust Rare Coin Was a Precious Metal and Coin Business, Subject to Heightened Supervision.**

51.     Defendant became aware that RRC was a precious metal and coin business, when RRC and Rust opened their accounts with Defendant. Thereafter, Defendant's knowledge of RRC's precious metal trading and coin business was reinforced and confirmed through (1)

16

Rust's ongoing interactions with Defendant's employees in its branch office, and in particular Individual 1, who had a close and detailed knowledge of RRC and Rust's business, and (2) Defendant's repeated review of Rust and RRC's business in connection with their credit applications to Defendant and its extensions of credit to them.

52.     First, at the outset of the relationship, and as a result of the due diligence it performed in connection with its opening of bank accounts for RRC and Rust, Defendant learned that RRC was a business that was organized to buy and sell precious metals and coins. Indeed, the very name of RRC indicates that the company was in the business of buying and selling coins. However, Defendant's knowledge was formed through due diligence in addition to reviewing RRC's name.

53.     Second, Defendant's employees in the branch office where Rust and RRC banked - and in particular Individual 1 – acquired an intimate and extensive knowledge of the nature of RRC's business, as a result of (1) their frequent interactions with him, (2) their processing of a large amount of wires from investors, which indicated on their face that RRC was running a precious metal trading business, (3) their regular review of RRC's business and the Silver Pool Investment Account as a result of multiple NSF incidents, and (4) their ongoing review of RRC's business and the Silver Pool Investment Account as a result of their BSA/AML duties, described in more detail below.

54.     Third, Rust indicated to many investors that they should reach out to Individual 1 in connection with their transfers of investment proceeds to Rust and RRC, to be invested in the Silver Pool. Investors did so, and through their interactions with them Individual 1 learned that (1) the money deposited in the Silver Pool Investment Account came from investors, (2) Rust

was managing the investors' money in a fiduciary capacity, and (3) Rust was telling investors that RRC was a precious metal trading operation.

55.    Fourth, Defendant repeatedly reviewed RRC's and Rust's business in connection with their applications for financing submitted to Defendant, and Defendant's due diligence prior to extending such financing.

56.    Upon learning that RRC was a precious metal and coin business – each of whom is classified as a "high-risk" operation under the AML rules – Defendant was required by the BSA/AML rules to put RRC on "enhanced due diligence" and subject the Investor Account to heightened supervision, as more fully described in Section "n" below, describing the regulatory framework applicable to Defendant's duties in connection with a high-risk non-bank financial business such as RRC.

57.    Defendant discharged its BSA/AML duties and, as a result of the heightened supervision of the RRC Investor Account, its staff, including Individual 1, learned that (1) the Silver Pool Investment Account was holding fiduciary money from numerous investors, (2) the fiduciary money in the Silver Pool Investment Account was commingled, (3) RRC and Rust were misusing money from the Silver Pool Investment Account, and (3) RRC and Rust were running a Ponzi scheme.

   f.    **Defendant Was Aware That the Silver Pool Investment Account Was Holding Fiduciary Funds.**

58.    Based on the Bank's due diligence procedures and BSA/AML duties described herein, Rust's ongoing interactions with Defendant's employees in its branch office, and in particular Individual 1, who had a close and detailed knowledge of RRC and Rust's business, Defendant's repeated review of Rust and RRC's business in connection with their credit applications to Defendant and its extensions of credit to them, Defendant's frequent review of

the Silver Pool Investment Account in connection with the massive amount of insufficient fund incidents, Defendant's manual processing of a large amount of wires from investors, which indicated on their face that the money was designated for "investment," that fact that investors were instructed to and did reach out to Individual 1 in connection with their transfers of money to Rust and RRC, to be invested in the Silver Pool, the Bank knew that the Silver Pool Investment Account was holding investor money.

59.     The Bank further knew that the deposited funds were to be managed by Rust and/or RRC as an investment manager and that Rust and/or RRC served in a fiduciary capacity to those investors.

60.     Thus, Zions Bank knew that the Silver Pool Investment Account was holding fiduciary funds.

   **g.     Defendant Received and Sent Wires and Checks Identifying the Money in the Silver Pool Investment Account as Investments.**

57.     Investors deposits into the Silver Pool Investment Account, clearly indicated that the money was earmarked as an investment in the Silver Pool. For example, A check in the amount of $500,000 was written on a Zions Bank checking account, and deposited into the Zions Bank Silver Pool Investment Account on June 7, 2018, states in the "memo" section that the check was for an "investment." Ex. 8, p. 1.

58.     Similarly, the following wires and checks were deposited into the Silver Pool Investment Account with similar notations:

   *a.*  A check dated October 2, 2017 for $100,000, made out to Rust Coin, with a "Rust Coin Investment" notation, Ex. 8, p. 2

   b.   A check dated April 22, 2014 for $99,500 made out to Rust Coin, with an "additional investment" notation; Ex. 8, p. 3.

c.  A check dated April 25, 2018 for $62,000, made out to Rust Rare Coin, with an "IRA Transfer" notation; Ex. 8 p. 4.

d.  A check dated April 16, 2018 for $500,000 made out to Rust Rare Coin, with an "Investment" notation; Ex. 8, p. 4.

e.  A wire dated April 24, 2018 for $165,000, sent to the account of Rust Rare Coin, with an "Investment for [redacted]" notation; Ex. 8, p. 5.

f.  A check dated January 29, 2018 for $330,000, made out to Rust Coin, with a "Silver Investment" notation; Ex. 8, p. 6.

g.  A check dated April 17, 2018 for $240,000 made out to Rust Rare Coin, with a "Silver Investment" notation; Ex. 8, p. 7.

h.  A check dated May 15, 2018 for $24,992.50 made out to Rust Coin, with a "Silver Investment" notation; Ex. 8, p. 8.

i.  A check dated February 2, 2018 for $600,000 made out to Rust Rare Coin Inc., with a "silver account" notation; Ex. 8, p. 9.

j.  A check dated June 6, 2018 for $100,000 made out to Rust Coin, with a "Silver Account" notation; Ex. 8, p. 10

k.  A check dated June 9, 2015 for $64,040 made out to Rust Rare Coin, with a "Silver Fund" notation; Ex. 8, p. 11

l.  A check dated June 26, 2018 for $100,000 made out to Rust Coin, with a "Rollover Acct." notation; Ex. 8, p. 12.

m.  A check dated February 14, 2018 for $50,000 made out to Rust Rare Coin, with a "Silver Investment" notation; Ex. 8, p. 13

n.  A check dated February 5, 2017 for $45,006.30 made out to Rust Rare Coins, with a "trading account" notation; Ex. 8, p. 14.

o.  A wire dated December 12, 2017 for $60,000 with the following instruction: **"These funds are for Gaylen Rust to invest in my silver account at the special offer of $14."** Ex. 8, p. 15.

61.    Rust and RRC also used the Silver Pool Investment Account to distribute funds to earlier investors in the Silver Pool that were clearly marked as investment distributions:

a.  Zions Bank Silver Pool Investment Account check dated February 26, 2018 for $16,550, with a "Feb 2018/1000 oz @ 16.55" notation; Ex. 9, p. 1

*b.*  Zions Bank Silver Pool Investment Account check dated August 7, 2018 for $30,940, with a "2000 oz @ 15.47" notation; Ex. 9, p. 2;

*c.*  Zions Bank Silver Pool Investment Account check dated March 12, 2018 for $2,500, with a "Mar2018/silver" notation  Ex. 9, p. 3

d.  ETF for $171,793.02 sent by RRC from the Zions Bank Silver Pool Investment Account to an earlier investor Ex 3, Hess Decl. ¶36].

**h.  Defendant Knew That Rust Was Managing an Investment Pool.**

62.    For the reasons stated above, and as a result of its frequent review of the Silver Pool Investment Account, Zions Bank knew that the Silver Pool Investment Account was an investment account which pooled a great number of investors' funds.

63.    Checks and wires were deposited into the Silver Pool Investment Account by investors, many of whom included notations in the check or wire indicating that the money was going toward the Silver Pool investment.

64.    Zions Bank knew that RRC was in the precious metal business, subjecting the Bank and the Silver Pool account to heightened scrutiny and supervision.  *See* Section (e) above. Zions Bank knew that the Silver Pool Investment Account contained funds contributed by investors and was not simply RRC's standard operating account.

65.    RRC and Rust were commodity pool operators, subject to the provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012). As the CFTC indicated in its Complaint against RRC and Rust, "[u]nder Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012), silver is a statutorily-defined commodity." *See also* 7 U.S.C. § 23(b)(1) (listing commodities such as silver bullion and bulk silver coins). Further, the Silver Pool was a commodity pool as

defined in Section 1(a)(10) of the Act, and RRC and Rust were commodity pool operators as defined Section 1(a)(11) of the act.

66.     The Commodity Exchange Act (CEA) and CFTC regulations require commodity pool operators to keep the property of their pool segregated, and prohibits them from commingling pool assets with the property of any other person. 17 C.F.R. § 4.20(c).

###### i.     Defendant Was Aware of a Massive Amount of Insufficient Fund Events.

67.     Zions Bank offers overdraft protection under certain circumstances on its business accounts. An overdraft occurs when a customer does not have sufficient funds in the account to cover a transaction. According to publicly obtained documents, in that circumstance, the Bank may, in its discretion, cover the transaction for the customer for a fee. According to the Bank's Business Accounts Schedule of Fees, the Bank charges its business customers an Insufficient Funds Fee ("Insufficient Funds Fee" or "NSF") of $32 per transaction posted against insufficient funds. The Bank had to manually review any overdrafts in the exercise of its discretion whether to honor the item presented for payment, meaning that the Bank reviewed the transactions in the account.

68.     Documents obtained by the CFTC directly from Zions Bank, which included copies of bank account statements, cancelled checks, deposit slips, debit and credit memos, wire transfer advices, wire data, and account setup and signature documentation for four RRC and nineteen related party bank accounts, show a massive amount of insufficient fund events in the Silver Pool Investment Account.

69.     Specifically, between January 2018 and August 2018 alone, items were presented for payment from the Silver Pool Investment Account on twenty-two separate days on which the account did not have sufficient funds to pay, often with multiple items presented for payment on

a given day. For example, on January 9, 2018, the Silver Pool Investment Account was charged Insufficient Funds Fees of $416, meaning that thirteen different items were presented for payment on that day for which the account did not have sufficient funds to pay. A week later, on January 17, 2018, the Investor Account was charged another $96 for Insufficient Funds, meaning that three items were presented for payment for which the Investor Account did not have sufficient funds to pay.

70.     That pattern continued, as the Silver Pool Investment Account was charged for Insufficient Funds Fees once in February and March 2018 respectively, on three different days in April, on four different days in May, three different days in June, four different days in July, and three different days in August. Based on the amounts charged, each of those situations necessarily involved multiple items presented for payment on a given day, as set forth below.

| Date | Account | Amount Charged | Description |
|------|---------|----------------|-------------|
| 1/9/18 | Zions – 7496 | $416 | Insuf. Funds Fees (13 items) |
| 1/17/18 | Zions – 7496 | $96 | Insuf. Funds Fees (3 items) |
| 2/21/18 | Zions – 7496 | $192 | Insuf. Funds Fees (6 items) |
| 3/21/18 | Zions – 7496 | $96 | Insuf. Funds Fees (3 items) |
| 4/5/18 | Zions – 7496 | $128 | Insuf. Funds Fees (4 items) |
| 4/26/18 | Zions – 7496 | $32 | Insuf. Funds Fee (1 item) |
| 4/27/18 | Zions – 7496 | $128 | Insuf. Funds Fees (4 items) |
| 5/8/18 | Zions – 7496 | $128 | Insuf. Funds Fees (4 items) |
| 5/9/18 | Zions – 7496 | $448 | Insuf. Funds Fees (14 items) |
| 5/25/18 | Zions – 7496 | $96 | Insuf. Funds Fees (3 items) |
| 5/30/18 | Zions – 7496 | $128 | Insuf. Funds Fees (4 items) |

| 6/6/18 | Zions – 7496 | $128 | Insuf. Funds Fees (4 items) |
|--------|--------------|------|------------------------------|
| 6/19/18 | Zions – 7496 | $64 | Insuf. Funds Fees (2 items) |
| 6/28/18 | Zions – 7496 | $160 | Insuf. Funds Fees (5 items) |
| 7/6/18 | Zions – 7496 | $32 | Insuf. Funds Fee (1 item) |
| 7/9/18 | Zions – 7496 | $320 | Insuf. Funds Fees (10 items) |
| 7/10/18 | Zions – 7496 | $352 | Insuf. Funds Fees (11 items) |
| 7/26/18 | Zions – 7496 | $64 | Insuf. Funds Fees (2 items) |
| 8/1/18 | Zions – 7496 | $128 | Insuf. Funds Fees (4 items) |
| 8/10/18 | Zions – 7496 | $64 | Insuf. Funds Fees (2 items) |
| 8/30/18 | Zions – 7496 | $96 | Insuf. Funds Fees (2 items) |

71.     In addition, the Bank imposes a Daily Overdraft Service Fee of $5, beginning the fifth consecutive calendar day the account is overdrawn more than $5. On July 9, 2018, the same day the Silver Pool Investment Account was charged $320 in Insufficient Funds Fees, the account was also charged a $15 Daily Overdraft Service Fee, meaning that the account was in an overdraft situation that lasted five business days before the fee was imposed.

**j.      Defendant Was Aware of Commingling.**

72.     Over 200 investors deposited funds into the Silver Pool Investment Account. Ex.4, p. 2.  The CFTC case documents numerous instances of investor money being commingled with Rust's other accounts at the Bank. The SEC Complaint provided a concise statement of Rust's commingling: "[f]unds are heavily commingled among these [the Silver Pool Investment Account and Rust's his other account ending in 3564] accounts because Rust transferred funds to and from them frequently."

73.     Based on all of the factors described herein, including the Bank's close scrutiny of Rust's businesses and the activity in his accounts, Zions Bank knew that investors' money was not being segregated for each investor's account as in a normal commodities trading operation.

74.     Zions Bank knew that investors' proceeds that were deposited for purported silver trading were being commingled with other non-investor money.

*75.*     Zions Bank knew that investors' funds were being commingled with Rust's personal funds and that the money in the Silver Pool Investment Account was being used to fund personal expenses and unrelated businesses that Rust was running.

**k.      Defendant Knew That the Vast Majority of Distribution Payments to Investors Came from Other Investors' Deposits, in Ponzi Fashion.**

76.     According to the CFTC investigation, the vast majority of distributions from the Silver Pool Investment Account were Ponzi scheme payments. The CFTC investigator determined that 67% of the funds raised from new investors were used to pay earlier investors and that the only source of RRC funds large enough to cover payments to the earlier investors is

from new investor funding. *See* Ex. 7, Strong Dec. ¶¶39, 46.



77.     All of these payments were processed from the Silver Pool Investment Account, and Zions Bank knew that this was the account where investors' funds were deposited.

78.     Based on the multiple sources of knowledge alleged herein including Rust's ongoing interactions with Defendant's employees in its branch office, in particular Individual 1, who had a close and detailed knowledge of RRC and Rust's business, Defendant's repeated review of Rust and RRC's business in connection with their credit applications to Defendant and its extensions of credit to them, Defendant's employees' in the branch office where Rust and RRC banked - and in particular Individual 1 – intimate and extensive knowledge of the nature of RRC's business as a result of their frequent interactions with him, their processing of a  large amount of wires from investors, their regular review of RRC's business and Silver Pool Investor Account as a result of multiple NSF incidents, their ongoing review of RRC's business and

Silver Pool Investor Account as a result of their BSA/AML duties, the fact that all of Rust's Silver Pool activity was conducted through a single account at the Bank, Individual 1 and other Bank employees directly saw the transactions in the Silver Pool Investment Account, revealing that Silver Pool had no substantive operations, the only money flowing into the account was new investor money, that no money was being disbursed for the purchase of silver or expenses related thereto, and that new investor money was being used to pay prior investors.

### l.  Defendants Provided a Crucial Financial Lifeline to Rust's Ponzi Scheme, Allowing It to Continue to Operate and Victimize Investors

79.     Defendant provided a crucial financial lifeline to RRC and Rust, thus allowing them to continue to operate their Ponzi scheme and victimize investors for far longer than it would have otherwise been able to. Defendant did so by (1) offering short-term emergency financing to cover RRC's frequent cash shortfalls, through an overdraft protection credit facility, and by (2) offering a considerable amount of credit to RRC and Rust, which was used by them to finance their fraudulent scheme.

80.     First, Defendant's short-term emergency financing in the form of an overdraft protection credit facility provided critical help to avoid RRC's early collapse. As with any Ponzi scheme, RRC's ability to continue to recruit new investors depended on making "clockwork" distribution payments to existing investors and honoring withdrawal requests promptly. A failure to make prompt payments – or worse, a check that "bounced" because of insufficient funds – would have quickly become known among the groups of investors who invested in RRC, many of whom knew each other. Once word of RRC's inability to repay investors got out, investors would have asked for their money back, prompting a "run on the bank," exposing RRC's Ponzi scheme, and precipitating its collapse – as always happens with Ponzi schemes. And, as it always happens with Ponzi schemes once payments are not made as promised and checks start to

bounce, investors would have alerted law enforcement or regulatory agencies, which would have quickly shut down the scheme. Indeed, that is precisely what appears happened with RRC – only much later, because of Defendant's financial assistance: once Rust and RRC were unable to promptly honor an investor's request to withdraw a considerable amount of money, that investor alerted the authorities and likely other investors.

81.     For each NSF or Insufficient Fund incident, typical banking procedures, which were also followed by Defendants, require the review of the incident and account at issue by the branch manager or a senior branch officer – here, Individual 1. This review is typically performed first thing in the morning after the branch opens, as to all new NSF incidents when various bank customers submitted payment requests to the bank in excess of the funds in their accounts.

82.     In RRC's case, Defendant chose to extend credit to RRC as to each NSF incident, to make up for the chronic shortage of funds in the Investor Account.

83.     Defendant's financial lifeline allowed Rust and RRC to postpone the inevitable collapse of their scheme by a considerable period of time, during which they continued to victimize new investors. As described above, in 2018 alone Defendant saved RRC from collapse several times *each month* and offered financing to cover a total of over 100 insufficient fund (NSF) incidents in the Investor Account – 100 incidents that, without Defendant's intervention, would have each prompted a chain of events culminating in RRC's collapse and the exposure of its fraud.

84.     In addition, Defendant offered RRC and Rust much needed financing that they used to keep their fraudulent operation in business and avoid detection and exposure.

Specifically, Defendant offered Rust and RRC a considerable amount of credit, which bank records show was repaid to Defendant on a monthly basis through 2018.

85.    The financing that Defendant offered to RRC and Rust allowed them, as Defendant knew from its ongoing review of the NSF incidents in the Silver Pool Investment Account, to avoid financial collapse. With the considerable financing from Defendant – likely in the six figures, based on bank records – RRC and Rust were able to continue to operate their fraudulent Ponzi scheme and victimize new investors.

86.    Lastly, Defendant's financing was repaid by RRC and Rust with funds from the Silver Pool Investment Account, which as Defendant knew contained money whose provenance was typically investment proceeds from new investors in the Silver Pool. In effect, Defendant's financial lifeline enabled RRC and Rust to continue to stay in business and victimize new investors, and in turn it was repaid by RRC and Rust with money that came from those new investors.

87.    Defendant offered RRC and Rust the critically needed financial lifeline that allowed them to continue to perpetrate their scheme, with knowledge that (1) the Investor Account contained fiduciary funds from investors; (2) money from the Investor Account was being commingled and misappropriated; and (3) money from the Investor Account was being used for Ponzi payments to other investors.

**m.    The SEC, CFTC, and Utah Securities Regulators Charge Rust with Ponzi Scheme, Detail Defendants' Role.**

88.    On November 13, 2018, the CFTC and Utah filed their civil enforcement action against defendants RRC, Gaylen Rust, and certain relief defendants charging Rust and RRC with fraud and asserting violations of the Commodities and Exchange Act and CFTC Regulations, aiding and abetting those violations, and multiple violations of the Utah Uniform Securities Act.

*See, Case* No. 2:18-CV-00892-TC (D. Utah) ("CFTC/Utah"). On the same day, the CFTC and

Utah filed an emergency, *ex parte* motion to freeze the defendants' assets, grant the CFTC and

Utah immediate access to the books, records and other documents of defendants, appoint a

temporary receiver, and permit expedited discovery.

89.     On November 15, 2018, two days later, the SEC filed its action charging Rust and

RRC with operating a fraudulent silver trading program. See, Case No. 1:18-cv-00147 (D. Utah

Nov. 15, 2018). The SEC complaint alleged the same course of conduct alleged in CFTC/Utah;

that Rust had been making material misrepresentations and omissions to solicit investors across

the country to invest in his scheme. The SEC also charged Rust and RRC with fraud and asserted

numerous violations of the federal securities laws.

90.     Both cases – CFTC/Utah and the SEC -- are pending before Judge Tena Campbell

of the United States District Court for the District of Utah.   Based on the docket activity,

CFTC/Utah is the lead case.

91.     On November 27, 2018, the Court approved the parties' consent order of

preliminary injunction in CFTC/Utah and appointed a Receiver.

92.     Following certain limited discovery, on December 6, 2018, the CFTC and Utah

filed an amended complaint charging Rust, RRC, and new defendants Denise Rust and Joshua

Rust, with operating a Ponzi scheme through which they misappropriated investor funds, used

those funds to make payments to other investors, transferred money to other companies owned

by Rust, and paid personal expenses.

93.     The CFTC and Utah alleged that from as early as 2008 through the date of filing,

Rust and his co-defendants Denise and Joshua were engaged in a massive scheme to defraud

over 430 individuals from Utah and at least sixteen other states, and fraudulently solicited over

$200 million from investors between May 2013 and August 2018 alone. The CFTC and Utah charged Rust and his co-defendants with tricking investors into believing that Rust was pooling investor funds for the purpose of entering contracts of sale for silver. According to the CFTC and Utah, Rust and RRC told investors that they would sell silver held in the pool as the market prices rose, and buy silver for the pool as market prices fell.

94.     According to CFTC/Utah, Rust's pitch to investors included a claim that he conducted his transactions through a trading account at HSBC Bank, and that he had a personal relationship with a commodity analyst through which Rust was able to obtain information regarding when the bank and other market participants planned to sell large quantities of physical silver, driving down market prices. By trading silver in this manner, Rust claimed he was able to generate extraordinarily high returns, averaging twenty to twenty-five percent per year, and sometimes as high as forty percent or more. Rust and RRC provided investors with account statements that showed him making money on every single trade he purportedly executed on behalf of the pool.

95.     Rust and RRC further told investors that Rust used the profit he generated from his trades to repurchase larger amounts of silver at the lower price, thereby continually increasing the amount of silver he holds for investors and thus increasing the value of each investor's account. Rust and RRC also represented to investors that Rust and RRC possessed approximately $77 to $80 million of physical silver on behalf of the silver pool, and they kept that silver at Brink's Incorporated's depositories in Salt Lake City and Los Angeles, California for safekeeping.

96.     In reality, according to the CFTC and Utah, the statements made by Rust and RRC were false. Neither Rust nor RRC ever had a trading account at HSBC. Rather than use

investor funds to buy silver, Rust diverted most of the investor funds to his other entities, to personal uses, such as, for example, mortgage payments on the home of a family member, and to make payments to other investors in the pool in the manner of a Ponzi scheme. The account statements Rust provided to investors were fake, and Rust and RRC possessed only approximately $200,000 worth of physical silver and did not store any silver at Brink's.

97.     All three regulators described the key role Defendant played in the Rust scheme. Specifically, according to CFTC/Utah, between January 1, 2018 and August 31, 2018, Rust and RRC received over $42 million in new contributions from investors, all of which was deposited in the Silver Pool Investment Account. During that time period, Rust and RRC made approximately $28 million in payments from the Silver Pool Investment Account to Silver Pool investors. During that same time period, Rust and RRC transferred approximately $7 million from the Silver Pool Investment Account to RRC's other Zion's Bank accounts, where it was commingled with funds from RRC's coin shop business. Rust and RRC also transferred large sums from the Silver Pool Investment Account to Rust's other business interests including R Legacy Entertainment, R Legacy Racing, and R Legacy Investments, as well as to the personal bank accounts of the defendants and relief defendants.

98.     The SEC Complaint also describes Defendant's role in the Rust scheme and how Rust used the Silver Pool Investment Account, along with his other account ending in 3564 to perpetrate his scheme. According to the SEC Complaint, "[f]unds are heavily commingled among these accounts because Rust transferred funds to and from them frequently."

99.     The CFTC/Utah case is proceeding ahead. On January 3, 2019, the Court entered an order requiring the defendants to provide a written and verified accounting by January 12, 2019 and allowing discovery to begin immediately.

n.    **Regulatory Framework Applicable to Zions Bank's Relationship with RRC; Zions Bank's Enhanced Due Diligence Duties as to RRC**

100.    Banks such as Zions Bank are required by federal law to know their customers and understand their banking activities and conduct. They must supervise their customers' accounts and engage in due diligence both at the outset of the relationship and continuously during the relationship with the customer. Such duties are heightened as to customers that deal with precious metals and coins, such as RRC, which are deemed to be high-risk customers and require "enhanced due diligence."

101.    Pursuant to applicable banking regulations, a bank is required to collect and maintain information concerning its customers. The bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. § 1020.220(a)(1).

102.    To discharge its duties, the bank is required to collect information about the holder of each account. 31 C.F.R. § 1020.220(a)(2). When a corporate entity rather than an individual opens an account, the bank must obtain information about the individuals with authority or control over the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C).

103.    Pursuant to the applicable federal rules and regulations, the bank must develop, administer, and maintain a program that ensures and monitors the bank's compliance with the Bank Secrecy Act (BSA). C.F.R. § 21.21. Such program must be approved by the bank's board of directors and noted in the board meeting minutes. A bank's compliance program must include a system of internal controls designed to ensure ongoing compliance, independent testing of the bank's compliance, daily coordination and monitoring of compliance by a designated person, and training of appropriate personnel.

104.    Under the applicable rules and regulations, a bank must also develop a customer due diligence program that assists the bank in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer. A bank's customer due diligence program allows it to maintain an awareness of the unique financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

105.    The FDIC rules and regulations require banks to identify a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. FDIC Rules & Regulations § 326.8. The compliance officer must designate an individual at each office or branch to monitor the bank's day-to-day compliance with the BSA.

106.    The Federal Financial Institutions Examination Council (FFIEC) was established by the federal government in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Act Anti-Money Laundering Manual contains an overview of BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC Manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies such as the Federal Reserve, Federal Deposit Insurance Corporation (FDIC) and the Office of the Comptroller of Currency. *See* FFIEC BSA/AML Examination Manual p. 1 and Appendix A (2014).  https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_aml_man_2014.pdf

107.    The FFIEC identifies precious metal dealers such as RRC as types of "nonbank financial institution" that can expose banks to higher risks. *Id.* at 299-300. The FFIEC further

cautions banks that customers who deal with precious metals and coins must be subjected to "enhanced due diligence." *Id.* at 283. The FFIEC provides special guidance to banks regarding the heightened supervision of customers like RRC, that use their bank accounts in connection with coins and precious metal. *Id.* at 20, 283.

108.    According to the FFIEC, banks that hold accounts for nonbank financial institutions such as RRC should: 1) develop policies, procedures, and processes to assess the risks posed by these particular type of clients; 2) conduct adequate and ongoing customer due diligence; 3) ensure the relationship is appropriately considered within the bank's suspicious activity monitoring and reporting systems, and 4) conduct further due diligence in a manner commensurate with any potential heightened risk. *Id.* at 300-301; *see also* 12 C.F.R. § 21.21 (requiring banks to develop, administer, and maintain a program that ensures compliance with the BSA).

109.    Customer due diligence policies, procedures and processes are the "cornerstone of a strong BSA/AML compliance program." FFIEC BSA/AML Examination Manual p. 56 (2014). This is even more so for those customers who present a higher risk for money laundering. The objective of customer due diligence is to "enable the bank to predict with relative certainty the types of transactions in which a customer is likely to engage." *Id*. An adequate customer due diligence program should "assist the bank in determining which transactions are potentially suspicious." *Id*.

110.    A bank's customer due diligence ("CDD") processes "should include enhanced CDD for higher-risk customers and ongoing due diligence of the customer base." *Id*. "Enhanced due diligence (EDD) for higher-risk customers is especially critical in understanding their anticipated transactions and implementing a suspicious activity monitoring system that reduces

the bank's reputation, compliance, and transaction risks. Higher-risk customers and their transactions should be reviewed more closely at account opening and more frequently throughout the term of their relationship with the bank." *Id.*

111.    For high-risk accounts such as RCC's Silver Pool Investment Account, a bank's enhanced due diligence duties may include obtaining, both when the account is opened and throughout the relationship with the customer, information regarding:

    a.  The purpose of the account.

    b.  The source of funds and wealth.

    c.  Occupation or type of business.

    d.  Proximity of the customer's residence, place of employment, or place of business to the bank.

    e.  Description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers.

    f.  Explanations for changes in account activity.

*Id.* at pp. 57-58. Lastly, "[a]s due diligence is an ongoing process, a bank should take measures to ensure account profiles are current and monitoring should be risk-based. Banks should consider whether risk profiles should be adjusted or suspicious activity reported when the activity is inconsistent with the profile." *Id.* at p. 58.

112.    As part of their customer due diligence for higher-risk customers, banks like Defendant are required to apply a risk rating to customers such as RRC. To determine RRC's risk rating, Defendant was required to obtain information about RRC to develop a "transaction profile" that incorporated an understanding of normal and expected activity for RRC's business operations. See, *Id., Appendix K.*

36

113.    Banks such as Defendant must also ensure that their employees are following BSA guidelines. Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations.

114.    Accordingly, banks such as Defendant are required to train all operational personnel whose duties may require knowledge of the BSA, on the BSA, including identification of various "red flags" discussed below. *See* FFIEC BSA/AML Examination Manual pp. 32-33 (2014).

115.    The FFIEC has identified "red flags" that should cause a bank or its employees to inquire further and potentially file a suspicious activity report. The Silver Pool Investment Account triggered at least the following "red flags," which resulted in Defendant's review of the Account:

> a.  Frequent and large deposits or withdrawals with no apparent business source;
>
> b.  Frequent wire transfers not justified by the nature of the business;
>
> c.  Accounts with a high volume of activity and frequently overdrawn;
>
> d.  High volume of wire transfers with low balance or overdrawn account;
>
> e.  Inconsistent deposit and withdrawal activity;
>
> f.  Transactions that are not consistent with the customer's business;
>
> g.  Intrabank transfers between accounts owned or controlled by the same individuals;
>
> h.  Appearance of using account as a temporary repository for funds;
>
> i.  Deposits and immediate requests for wire transfers or cash shipments; and
>
> j.  Large deposits.

116.     Banks such as Defendant must investigate red flags that could indicate suspicious activity. *Id*. at 269. Such investigation must include the review of customer documents. "Reliable documentation is critical in identifying potentially suspicious activity." *Id*.

117.     Pursuant to its BSA/AML duties, Defendant learned that RCC and its Silver Pool – a business that dealt in precious metals and coins – qualified as a high-risk business that warranted enhanced due diligence.

118.     Pursuant to its BSA/AML duties, Defendant had an opportunity to review, and did review RRC and the Silver Pool and the Silver Pool Investment Account, and learned that:

     a.   RRC was a precious metal and coin dealer;

     b.   RRC had a silver trading operation called the Silver Pool;

     c.   RRC received investment proceeds from investors in the Silver Pool, to be invested by RRC and Rust;

     d.   RRC and Rust were managing investor money as fiduciaries, and the Silver Pool account held fiduciary funds;

     e.   RRC and Rust were misusing funds from the Silver Pool account, by commingling such funds and transferring them to Rust, his family, and other entities whose business was unrelated to the Silver Pool;

     f.   RRC and Rust were misusing investor money for Ponzi payments;

     g.   The Silver Pool was not a real business or trading operation, but a Ponzi scheme.

**o.     Defendant's Knowledge of Rust's Fraud and Breach of Fiduciary Duty**

119.     The multiple sources of Defendant's actual knowledge of Rust's fraud and breach of fiduciary duties, described above in more detail, are summed-up as follows.

120.     First, Defendant became aware that RRC was a precious metal and coin business, when RRC and Rust opened their accounts with Defendant as a result of the Bank's customer

due diligence process. That due diligence process identified the Silver Pool Investment Account as a high risk account requiring enhanced due diligence.

121.    Second, Defendant's knowledge of RRC's precious metal trading and coin business was reinforced and confirmed through (1) Rust's ongoing interactions with Defendant's employees in its branch office, and in particular Individual 1, who had a close and detailed knowledge of RRC and Rust's business, (2) Defendant's ongoing due diligence as to RRC and the Silver Pool Investment Account, and (3) Defendant's repeated review of Rust and RRC's business in connection with their credit applications to Defendant and its extensions of credit to them.

122.    Third, Defendant's employees in the branch office where Rust and RRC banked - and in particular Individual 1 – acquired an intimate and extensive knowledge of the nature of RRC's business and transactions in the Silver Pool Investment Account, as a result of (1) their frequent interactions with him, (2) their processing of a  large amount of wires from investors, which indicated on their face that RRC was running a precious metal trading business, (3) their regular review of RRC's business and Silver Pool Investor Account as a result of multiple NSF incidents, and (4) their ongoing review of RRC's business and Silver Pool Investor Account as a result of their BSA/AML duties, described in more detail above.

123.    Fourth, Rust indicated to many investors that they should reach out to Individual 1 as a point of contact in connection with their transfers of investment proceeds to Rust and RRC, to be invested in the Silver Pool. Many investors did so, and through Individual 1's interactions with investors, Individual 1 learned that (1) the money deposited in the Silver Pool Investment Account came from investors, (2) Rust was managing the investors' money in a fiduciary capacity, and (3) Rust was telling investors that RRC was a precious metal trading operation.

124.    Fifth, Defendant repeatedly reviewed RRC's and Rust's business in connection with their applications for financing submitted to Defendant, and Defendant's due diligence prior to extending such financing.

125.    Sixth, all of Rust's Silver Pool activity was conducted through a single account at the Bank. This account received close attention from employees of Defendant, particularly Individual 1. Individual 1 necessarily reviewed the Silver Pool Investment Account because the Silver Pool Investment Account experienced an enormous amount of insufficient fund events, each of which had to be reviewed manually by a senior person at Zions Bank as part of the Bank's procedure whereby it had to decide whether to honor each payment on Rust's behalf, and also in connection with Defendant's review and approval of Rust and RRC's application for financing, and pursuant to Defendant's AML/BSA ongoing due diligence review. Thus, Individual 1 and other Bank employees directly saw the transactions in the Silver Pool Investment Account, including that Silver Pool had no substantive operations, the only money flowing into the account was new investor money, the lack of any disbursements for the purchase of silver or expenses related thereto, the diversions to Rust and his businesses and his family members, the use of investor money from the Silver Pool Investment Account to repay a loan to Zions Bank, and the use of new investor money to pay prior investors in Ponzi scheme fashion.

126.    Each of the above factors individually is sufficient to support actual knowledge, but cumulatively, they overwhelmingly support Defendant's knowledge that Rust was operating a Ponzi scheme and using investor money for improper purposes.

**p.    Defendant Provided Crucial and Substantial Assistance to RRC and Rust's Ponzi Scheme.**

127.    As described above, Defendant knowingly provided crucial and substantial assistance to RRC and Rust's Ponzi scheme, in several ways: first, Defendant lent RRC and Rust

a financial lifeline without which their Ponzi scheme could not have continued to operate, through (1) the short-term financing designed to cover the frequent and ongoing insufficient fund incidents and (2) the considerable amount of credit to both Rust and RRC, which enabled them to continue to run their fraudulent operations.

128.    Second, Defendant knowingly executed transactions with investor, fiduciary funds that were on their face a misuse of such fiduciary funds: transfers to Rust's other businesses, himself, and his family, and commingling, in violation of RRC and Rust's fiduciary duties to investors and also in violation of the commodities rules and regulations that prohibited commingling.

129.    Third, Defendant knowingly executed transactions that it knew were Ponzi payments, by transferring money to investors that it knew belonged to other investors.

130.    Fourth, Defendant's employees, and in particular Individual 1, helped facilitate RRC and Rust's Ponzi scheme by interacting with investors in connection with their investments, facilitating their deposits of funds into the Silver Pool Investment Account, and "covering up" for RRC and Rust and assisting them despite the clear evidence of misconduct.

131.    Defendant's knowing assistance was a substantial departure from the typical banking operations, and was essential to the perpetration of the Silver Pool fraud. Without Defendant's help, Rust and RRC's fraud would not have been able to continue and would have quickly collapsed and been exposed.

     **r.    Discovery Rule**

132.    The Silver Pool scheme's fraudulent and illegal acts and omissions were, by their nature, self-concealing. The perpetrators of the Silver Pool scheme actively suppressed the dissemination of truthful information regarding the Silver Pool scam and actively sought to

prevent Plaintiffs and the putative class members from discovering their fraudulent and illegal acts and omissions.

133.     Plaintiffs could not have discovered, and in fact did not discover, the facts surrounding the fraudulent Silver Pool scam, and Defendant's involvement therein, until the Commodity Futures Trading Commission and State of Utah Division of Securities filed their Complaint on November 13, 2018.  (CFTC et al. v. Rust Rare Coin, Inc. et al., Case No. 18-00892, U.S. District Court for the District of Utah, Dkt. No. 1).

## VIII.   CLASS ACTION ALLEGATIONS

134.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a putative class of persons defined below:

> All persons and entities that paid for an interest in the Silver Pool
> scheme and that deposited or wired payments for such interest in
> an account maintained by Defendant (the "Class").

136.     Excluded from the Class are (1) Defendant, (2) any person, firm, corporation, or other entity related to or affiliated with Defendant, or in which the Defendant has or had a controlling interest; (3) Gaylen Rust, Denise Rust, Joshua Rust, and their immediate family members; (4) all other employees of Rust Rare Coin, Inc.; and (5) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.  The requirements for maintaining this action as a class action are satisfied as follows.

Fed. R. Civ. P. 23(a)(1): Numerosity.  The proposed class is so numerous and so geographically dispersed that the individual joinder of all absent class members is impracticable. While the exact number of absent class members is unknown to Plaintiffs at this time, it is ascertainable by appropriate discovery and Plaintiffs are informed and believe that the proposed class includes more than 400 members, thus satisfying the requirements of Rule 23(a)(1).

Members of the proposed class may be identified from records maintained by Defendant and RRC, and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in class actions.

135.   <u>Fed. R. Civ. P. 23(a)(2): Common Questions of Law or Fact Predominate</u>. Common questions of law or fact exist as to all members of the proposed class and predominate over any questions which affect only individual members of the proposed class. These common questions of law or fact include, but are not limited to:

a.   Whether RRC, Gaylen Rust, Denise Rust, and/or Joshua Rust defrauded Plaintiffs and the other investors in the Silver Pool scheme;

b.   Whether RRC, Gaylen Rust, Denise Rust, and/or Joshua Rust violated the federal and state securities and/or commodities laws in connection with the Silver Pool scheme;

c.   Whether RRC, Galyen Rust, Denise Rust, and/or Joshua Rust converted monies in invested in the Silver Pool Investment Program;

d.   Whether Defendant owed Plaintiffs and the putative class members legal duties, and the scope of any such duties;

e.   Whether Defendant breached any fiduciary and/or legal duty to Plaintiffs and the putative class members;

f.   Whether Defendant had knowledge of the fraudulent Silver Pool scheme and RRC, Gaylen Rust, Denise Rust, and/or Joshua Rust's fraudulent and illegal activities;

g.  Whether Defendant participated in and/or substantially assisted in the fraudulent Silver Pool scheme and RRC, Gaylen Rust, Denise Rust, and/or Joshua Rust's fraudulent and illegal activities;

h.  Whether Defendant acted negligently in connection with the Silver Pool scheme;

i.  Whether Plaintiffs and the putative class members suffered damages as a result of Defendant's conduct;

j.  Whether Plaintiffs and the putative class members are entitled to damages and, if so, the amount of such damages;

136.  <u>Fed. R. Civ. P. 23(a)(3) and (4): Typicality and Adequacy</u>.  Plaintiffs' claims are typical of the claims of the putative class members, and Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel with substantial experience in prosecuting complex class-action cases. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class, and have the financial resources to do so. Neither Plaintiffs nor their counsel has any interests adverse to those of the class members.

137.  <u>Fed. R. Civ. P. 23(b)(1)(A)</u>:  A class action is appropriate because the prosecuting of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

138.  <u>Fed. R. Civ. P. 23(b)(3)</u>:  A class action is appropriate because the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  There is no special interest in the class members in individually

controlling the prosecution of separate actions.  Absent a class action, many class members would likely find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law.  Absent class action, class members will continue to suffer harm and Defendants misconduct will proceed without remedy.  The class treatment of common questions of law or fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

## IX.     LEGAL CLAIMS

### COUNT I:  AIDING AND ABETTING FRAUD

139.    Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

140.    The Silver Pool scheme was fraudulent because, among others, the Rust Scheme Perpetrators knowingly misrepresented that:

   a.   The Silver Pool generated profits for investors by selling silver when market prices were high and purchasing silver when market prices were low;

   b.   The Silver Pool generated consistent double-digit returns, and had occasionally generated returns as high as forty percent, by trading physical silver;

   c.   Investor funds were used to purchase physical silver stored at Brink's storage facilities in Salt Lake City, Utah and Los Angeles, California;

   d.   The Rust Scheme Perpetrators used all of the funds raised from investors to purchase physical silver for the Silver Po; and

   e.   The Rust Scheme Perpetrators could and would sell silver to fund any liquidation request by an investor.

141.    The Rust Scheme Perpetrators also disseminated false account statements to investors that purported to show the number of ounces of silver involved in each sale, the price at which the silver was sold and repurchased, and the number of ounces of silver held by RRC increased as a result of each trade.  All such information was fabricated.

142.    Additionally, the Rust Scheme Perpetrators omitted to disclose certain material facts, including that:

   a.    Investor funds were being diverted to pay certain of the Rust Scheme Perpetrators unrelated personal and business expenses, and business expenses of various other entities owned and/or controlled by Gaylen Rust;

   b.    Distributions were being paid out of money contributed by other investors, Ponzi-style, and not from sales of silver; and

   c.    The Rust Scheme Perpetrators were not licensed to sell securities and the securities were not registered or exempt from registration.

143.    The Rust Scheme Perpetrators also failed to disclose any of the information typically included in disclosure documents that accompany the sale of securities.

144.    Such misrepresentations and omissions were material—indeed, essential—to the Plaintiffs and putative class members, who had no reason to believe their money would not be used in the manner represented.

145.    The Rust Scheme Perpetrators intended the Plaintiffs and putative class members to rely on such misrepresentations and omissions, and they did rely thereon when investing.

146.    Plaintiffs and the putative class members lost a significant portion of their investments when their money was misused as described above.

147.    Defendant had actual knowledge of the Silver Pool scheme and its fraudulent nature. Among other things, and as discussed in detail above, Defendant knew that:

a.  The Rust Scheme Perpetrators utilized a single account at Zions Bank;

b.  The Rust Scheme Perpetrators's business involved the purchase and sale of precious metals, a business subject to heightened supervision;

c.  The Silver Pool was not registered with the Utah Division of Securities or the United States Securities and Exchange Commission;

d.  The Rust Scheme Perpetrators managed an investment pool (by virtue of the fact that they received funds described as "investments[s]");

e.  The Rust Scheme Perpetrators' account was holding fiduciary funds, to be used by Rust and RRC to purchase, store, and trade silver for the Silver Pool investors;

f.  Investor funds were commingled with Rust's personal funds and the money in the Silver Pool account was used to fund Rust's personal and unrelated business expenses;

g.  Payments to certain investors were being made out of the same account and with the same funds that other investors used to invest in the Silver Pool;

h.  No money was deposited into the Silver Pool Investment Account resulting from trading profits by Rust or RRC, or as a result of any of the activities of the Silver Pool;

i.  No payments were ever made out of the Silver Pool Investment Account to HSBC to account for the purchase of silver;

    j.   No storage fee payments were ever made out of the Silver Pool Investment Account to Brinks;

    k.   The Silver Pool Investment Account ordinarily had a low or negative balance, and incurred a significant number of insufficient fund events; and

    l.   Rust and RRD only made distributions when deposits were made by new investors.

148.    Despite knowing about the Silver Pool's fraudulent nature, Defendant knowingly participated in and provided substantial assistance to the Silver Pool scheme by, among other things:

    a.   Through its employees and agents including Individual 1, helping facilitate the Silver Pool scheme by interacting with investors regarding their investments and facilitating the deposit of their investments into the Silver Pool Investment Account;

    b.   Divesting and misdirecting a significant portion of the investors' money, which were fiduciary funds, to the Rust Scheme Perpetrators personal and business accounts;

    c.   Making Ponzi-style payments to investors, which investors believed to be distributions on their investments, with knowledge that such money came from investor proceeds deposited by others;

    d.   Extending short term financing to Rust and RRC designed to cover the frequent insufficient funds events; and

    e.   Extending considerable amounts of credit to Rust and RRC which enabled them to continue to run the fraudulent Silver Pool scheme.

149.    Defendant's misconduct was the proximate cause of Plaintiffs' and the putative class members' losses, because it directly and proximately resulted in the misuse and misappropriation of their investments.

150.    As a direct and proximate consequence of Defendant's misconduct as described above and throughout this Complaint, Plaintiffs and the putative class members lost a substantial portion of the money they invested in the Silver Pool in an amount to be determined at trial but well in excess of $5,000,000.

### COUNT II:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

151.    Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

152.    The Rust Scheme Perpetrators owed fiduciary duties to the Silver Pool investors because they managed the Silver Pool  and promised investors they would carefully and diligently invest their money, and because the investors relied entirely on the skill and diligence of the Rust Scheme Perpetrators to manage their investments. The Rust Scheme Perpetrators touted their superior knowledge, skill, diligence, and expertise in buying and selling silver, and the investors relied on such representations and entrusted their money to the Rust Scheme Perpetrators because they believed they would use their superior skill and expertise to manage the investments.

153.    The Rust Scheme Perpetrators breached their fiduciary duties to the investors by, among other things, defrauding them and misusing their money, as described in detail above.

154.    As described in detail above, Defendant had actual knowledge that the Rust Scheme Perpetrators owed the Silver Pool investors fiduciary duties, and that they had engaged and were engaging in the conduct described above in violation of those fiduciary duties.

49

155.   Despite this knowledge, Defendant knowingly participated in and provided substantial assistance to the Rust Scheme Perpetrators' breaches of their fiduciary duties by, among other things:

      a.   Through its employees and agents including Individual 1, helping facilitate the Silver Pool scheme by interacting with investors regarding their investments and facilitating the deposit of their investments into the Silver Pool Investment Account;

      b.   Divesting and misdirecting a significant portion of the investors' money, which were fiduciary funds, to the Rust Scheme Perpetrators personal and business accounts;

      c.   Making Ponzi-style payments to investors, which investors believed to be distributions on their investments, with knowledge that such money came from investor proceeds deposited by others;

      d.   Extending short term financing to Rust and RRC designed to cover the frequent insufficient funds events; and

156.   Extending considerable amounts of credit to Rust and RRC which enabled them to continue to run the fraudulent Silver Pool scheme.Defendant's misconduct was the proximate cause of Plaintiffs' and the putative class members' losses, because it directly and proximately resulted in the misuse and misappropriation of their investments.

157.   As a direct and proximate consequence of Defendant's misconduct as described above and throughout this Complaint, Plaintiffs and the putative class members lost a substantial portion of the money they invested in the Rust Scheme in an amount to be determined at trial but well in excess of $5,000,000.

## COUNT III:  BREACH OF FIDUCIARY DUTY

158.    Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

159.    Defendant served as an escrow custodian for the Silver Pool investors' money, and therefore owed to Plaintiffs and the putative class members a fiduciary duty with respect the monies deposited in the Silver Pool Investment Account under its oversight and custody.

160.    Defendant breached this fiduciary duty by, among other things:

   a.   Through its employees and agents including Individual 1, helping facilitate the Silver Pool scheme by interacting with investors regarding their investments and facilitating the deposit of their investments into the Silver Pool Investment Account;

   b.   Divesting and misdirecting a significant portion of the investors' money, which were fiduciary funds, to the Rust Scheme Perpetrators personal and business accounts;

   c.   Making Ponzi-style payments to investors, which investors believed to be distributions on their investments, with knowledge that such money came from investor proceeds deposited by others;

   d.   Failing to notify the Silver Pool investors about the diversion and misdirection of their funds deposited in the Silver Pool Investment Account;

   e.   Extending short term financing to Rust and RRC designed to cover the frequent insufficient funds events; and

   f.   Extending considerable amounts of credit to Rust and RRC which enabled them to continue to run the fraudulent Silver Pool scheme.

158.    Defendant's misconduct was the proximate cause of Plaintiffs' and the putative class members' losses, because it directly and proximately resulted in the misuse and misappropriation of their investments.

159.    As a direct and proximate consequence of Defendant's misconduct as described above and throughout this Complaint, Plaintiffs and the putative class members lost a substantial portion of the money they invested in the Rust Scheme in an amount to be determined at trial but well in excess of $5,000,000.

## COUNT IV:  AIDING AND ABETTING CONVERSION

161.    Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

162.    The Rust Scheme Perpetrators willfully misappropriated the investors' funds in the Silver Pool Investment Account and converted those funds for their own unrelated personal and business purposes.

163.    As described in detail above, Defendant had actual knowledge that the Rust Scheme Perpetrators had converted and were continuing the convert the investors' funds in the Silver Pool Investment Account for their own unrelated personal and business purposes.

164.    Despite this knowledge, Defendant knowingly participated in and provided substantial assistance to the Rust Scheme Perpetrators's ongoing conversion by, among other things:

        a.   Through its employees and agents including Individual 1, helping facilitate the Silver Pool scheme by interacting with investors regarding their investments and facilitating the deposit of their investments into the Silver Pool Investment Account;

b. Divesting and misdirecting a significant portion of the investors' money, which were fiduciary funds, to the Rust Scheme Perpetrators personal and business accounts;

c. Making Ponzi-style payments to investors, which investors believed to be distributions on their investments, with knowledge that such money came from investor proceeds deposited by others;

d. Extending short term financing to Rust and RRC designed to cover the frequent insufficient funds events; and

e. Extending considerable amounts of credit to Rust and RRC which enabled them to continue to run the fraudulent Silver Pool scheme.

165.   Defendant's misconduct was the proximate cause of Plaintiffs' and the putative class members' losses, because it directly and proximately resulted in the misuse and misappropriation of their investments.

166.   As a direct and proximate consequence of Defendant's misconduct as described above and throughout this Complaint, Plaintiffs and the putative class members lost a substantial portion of the money they invested in the Rust Scheme in an amount to be determined at trial but well in excess of $5,000,000.

## COUNT V:  NEGLIGENCE

167.   Plaintiffs and the putative class members hereby incorporate by reference the preceding paragraphs as though fully set forth herein.

168.   Defendant owed Plaintiffs and the putative class members a duty to act as a reasonable financial institution would under the circumstances.

169.   Defendant was negligent and breached this duty by, among other things:

a. Through its employees and agents including Individual 1, helping facilitate the Silver Pool scheme by interacting with investors regarding their investments and facilitating the deposit of their investments into the Silver Pool Investment Account;

b. Divesting and misdirecting a significant portion of the investors' money, which were fiduciary funds, to the Rust Scheme Perpetrators personal and business accounts;

c. Making Ponzi-style payments to investors, which investors believed to be distributions on their investments, with knowledge that such money came from investor proceeds deposited by others;

d. Failing to notify the Silver Pool investors about the diversion and misdirection of their funds deposited in the Silver Pool Investment Account;

e. Extending short term financing to Rust and RRC designed to cover the frequent insufficient funds events; and

170.    Extending considerable amounts of credit to Rust and RRC which enabled them to continue to run the fraudulent Silver Pool scheme. Defendant's negligence was the proximate cause of Plaintiffs' and the putative class members' losses, because it directly and proximately resulted in the misuse and misappropriation of their investments.

171.    As a direct and proximate consequence of Defendant's misconduct as described above and throughout this Complaint, Plaintiffs and the putative class members lost a substantial portion of the money they invested in the Rust Scheme in an amount to be determined at trial but well in excess of $5,000,000

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the putative class members respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.      Determine that the action is a proper class action pursuant to Fed. R. Civ. P. 23; appoint Plaintiffs as class representatives; and appoint Plaintiffs' counsel as counsel for putative class members;

B.      Awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial.

C.      Awarding statutory attorneys' fees and costs, and other relief.

D.      Granting such other and further relief as to this Court may seem just and proper.

### XI.      JURY DEMAND

Plaintiffs and putative class members request that all issues herein shall be tried to a jury.

January 8, 2019                              Respectfully submitted,

*/s/ Samuel Adams*
Samuel Adams
ADAMS DAVIS P.C.
35 Broadway, Suite 203
Salt Lake City, UT 84101
Telephone:      (801) 532-9500
Email:          sam@adamsdavis.com


Alan L. Rosca (*pro hac vice forthcoming*)
Mark Goldman (*pro hac vice forthcoming*)
Paul Scarlato (*pro hac vice forthcoming*)
GOLDMAN SCARLATO & PENNY PC
Eight Tower Bridge, 161 Washington St
Conshohocken, PA 19428
23250 Chagrin Blvd., Suite 100
Beachwood, OH 44122
Telephone:      (484) 342-0700
Email:          rosca@lawgsp.com
                goldman@lawgsp.com
                scarlato@lawgsp.com


J. Barton Goplerud (*pro hac vice forthcoming*)

Brian O. Marty (*pro hac vice forthcoming*)
SHINDLER ANDERSON GOPLERUD &
WEESE PC
5015 Grand Ridge Dr, Ste 100
West Des Moines, IA 50265
Telephone:     (515) 223-4567
Facsimile:     (515) 223-8887
Email:         goplerud@sagwlaw.com
               marty@sagwlaw.com

*Interim Class Counsel for Plaintiffs*